FILED

2006 Jun-07  PM 05:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ANTONIO SALDANA HERNANDEZ,** et al., | } } } |
| | } |
| **Plaintiffs,** | } |
| | } **CASE NO. 2:04-CV-3460-RDP** |
| **v.** | } |
| | } |
| **THE CITY OF HOOVER, et al.,** | } |
| | } |
| **Defendants.** | } |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendants' Motion for Summary Judgment (Doc. # 17) filed January 17, 2006.  The motion has been fully briefed and was under submission as of February 17, 2006.  (Docs. # 4, 10, 14).

On December 17, 2004, Plaintiffs Antonio Saldana Hernandez ("Hernandez") and Sandy Herman-Hernandez ("Mrs. Hernandez") brought suit in this court against Defendants The City of Hoover, Alabama (the "City") and Police Officer Jacob Pugh, in his individual capacity, ("Officer Pugh") for injuries Hernandez allegedly sustained as a result of excessive force used by Officer Pugh during his arrest. (Doc. # 1).[1]   Although Plaintiffs' original complaint asserted violations of the Fourth, Eighth and Fourteenth Amendments through the vehicle of 42 U.S.C. § 1983 and various state law claims, Plaintiffs have voluntarily abandoned all claims with the exception of Hernandez's § 1983 Fourth Amendment excessive force claim against Officer Pugh and his state law assault and battery claims against both the City and Officer Pugh.  (Docs. # 26, 27).[2]

---

[1] Mrs. Hernandez asserts only a derivative loss of consortium claim.  (Doc. # 1, at 3).

[2] Plaintiffs also concede that they are not entitled to an award of punitive damages against the City of Hoover under either state or federal law, and that their damages under state law against the City

As discussed in detail below, the court is persuaded that Officer Pugh has carried his burden on summary judgment of demonstrating that there are no material facts in dispute and that he is entitled to the protection of qualified immunity, and therefore judgment as a matter of law, on Hernandez's § 1983 claim against him.  The court, in its discretion, chooses not to retain jurisdiction over the remaining state law claims, and those claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## I.      Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.

## II.     Relevant Undisputed Facts[3]

On the evening of July 12, 2003, after having dinner and drinks with friends at a Mexican restaurant, Hernandez and three of his friends stopped at a Chevron gas station on Lorna Road in Hoover, Alabama to purchase gas and beer. (Hernandez Dep. at 38-46).  At the Chevron, another

---

and Officer Pugh are limited to the $100,000.00 cap located in Alabama Code § 11-93-2. (Docs. # 26, 27).  It is not clear to the court whether Mrs. Hernandez has conceded her state law loss of consortium claim.  In any event, the court has opted to decline pendent jurisdiction over all state law claims asserted by the Plaintiffs and will dismiss them without prejudice.

  [3] If facts are in dispute, they are stated in the manner most favorable to the Plaintiffs.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

customer accused Hernandez's companions of looking at his girlfriend, which prompted a verbal altercation. (Hernandez Dep. at 41-42). The four men then left the gas station in a Mazda "kingcab" truck and headed to an apartment complex. (Hernandez Dep. at 37, 43).

In the meantime, several City of Hoover police officers received a dispatched call to respond to a fight at the Chevron on Lorna Road. (Gregory Dep. at 9; McDonald Dep. at 7; Eichorn Dep. at 7). Officer McDonald arrived on the scene first, and when he pulled into the parking lot of the Chevron, he heard a female scream, "That's them. They go there." while pointing to a Mazda truck that was pulling out of the parking lot. (McDonald Dep. at 7-8). Officer McDonald followed the truck into the parking lot of Hartwood Apartments, pulled his vehicle in behind the suspect vehicle, activated his lights, and started to exit his car. (McDonald Dep. at 8-9; Hernandez Dep. at 47). At that point, the truck began to back-up toward Officer McDonald. (McDonald Dep. at 9; Hernandez Dep. at 38). After Officer McDonald drew his weapon and yelled for the driver to stop, the vehicle stopped. (McDonald Dep. at 9).

By that time, Sergeant Gregory and Officer Eichorn had arrived at the apartment complex. (Gregory Dep. at 10; Eichorn Dep. at 7-8). The officers approached the truck, and with weapons drawn, ordered the occupants to exit the vehicle one at a time by backing up toward the officers with their hands up. (Hernandez Dep. at 47-49; Doc. # 28, at Ex. 5, at 9, 36).[4] The driver exited first and was handcuffed and searched. (Hernandez Dep. at 48-51; McDonald Dep. at 10).

---

[4] The officers used the "felony take down" approach - ordering the suspects to face away from the officers as they exited the vehicle - because based upon "[t]he limited information we had, we approached as worse case scenario for officer safety. It was a fight, an assault, and that is why we approached it the way we did." (Doc. # 28, Ex. 5 (hereinafter "Criminal Trial Excerpts") at 8, 16, 19-20). The advantage of a felony take down is that the suspect is "blind to the situation." (Criminal Trial Excerpts at 36).

Meanwhile, Officer Pugh was out on another call when he heard and responded to Sergeant Gregory's request for assistance with several suspects at Hartwood Apartments. (Criminal Trial Excerpts at 33-34; Pugh Dep. at 18-19).[5] When Officer Pugh arrived at the apartment complex, Sergeant Gregory and Officer McDonald were standing 15-20 feet behind the suspect vehicle with guns drawn. (Criminal Trial Excerpts at 34; Pugh Dep. at 20). Officer Pugh observed that at least one suspect was handcuffed and sitting on the ground outside of the vehicle while one suspect was still sitting in the vehicle. (Criminal Trial Excerpts at 34, 37; Pugh Dep. at 21; Hernandez Dep. at 48-49).[6]

Hernandez was then told to exit the vehicle, put his hands in the air, and turn away from the officers. (Criminal Trial Excerpts at 10-11, 36; Pugh Dep. at 21, 24). Although Hernandez eventually did as he was instructed, he had to be told several times before he complied. (Criminal Trial Excerpts at 10-11 (Gregory Testimony), 36 (Pugh Testimony); Gregory Dep. at 14; Pugh Dep. at 21, 24-25).[7] Officer Pugh observed that Hernandez "appeared to be stumbling around as he was

---

[5] Officer Pugh testified that when he arrived at the scene, he did not know why the suspect vehicle had been pursued initially because he had not heard the first dispatch regarding the fight at the Chevron. (Criminal Trial Excerpts at 41).

[6] According to Hernandez, two suspects had exited the vehicle and been handcuffed by the time that Officer Pugh arrived. (Hernandez Dep. at 48-49). Although the officers recall that Hernandez was the second - not the third - suspect out of the vehicle, leaving two suspects unrestrained in the car (Criminal Trial Excerpts at 34, 37; Pugh Dep. at 21), the court will adopt Hernandez's version of the facts and assume that only one suspect remained unrestrained in the vehicle after Hernandez exited the car.

[7] Although Hernandez's summary judgment brief focuses on the fact that he did *eventually* comply with the officers' orders, he does not dispute that he *initially* failed to do so. In his Statement of Additional Undisputed Facts, he admits "**[a]fter some initial confusion**, Mr. Hernandez did as the officers commanded and approached them with his hands in the air and his back towards the armed officers." (Doc. # 26, at 8 (citing (Criminal Trial Excerpts at 35-37)(emphasis added)). Hernandez's deposition testimony states only: "I got out of the car and they put the handcuffs there."

4

getting out [of the suspect vehicle]," and as he approached Hernandez, he noticed "an odor of alcohol coming from his person." (Criminal Trial Excerpts at 39-40).  Officer Pugh then handcuffed Hernandez and checked him for weapons.  (Hernandez Dep. at 50).[8]

After handcuffing Hernandez, Officer Pugh asked him to sit down twice in English and twice in Spanish.  (Criminal Trial Excerpts at 12 (Gregory Testimony), 37-38, 40 (Pugh Testimony); McDonald Dep. at  11-19; Gregory Dep. at  15; Pugh Dep. at  22; Pugh Aff; Philson Dep. at 8). Instead of sitting down, Hernandez turned around toward Officer Pugh and asked "why are you arresting me."  (Hernandez Dep. at 51; Pugh Dep. at 22-27; Criminal Trial Excerpts at 12 (Gregory Testimony), 37-38 (Pugh Testimony); McDonald Dep. at  12).  Hernandez admits that he turned around to talk to Officer Pugh (Hernandez Dep. at 51), although he does not remember whether he was asked to sit down:

> Q:     Did the officer ask you to sit down?
> A:     As far as – I don't know that he was talking to me, you know, I mean, I'm – he is behind me.  I don't know if he's talking to me or to the other guy because the other guy is beside me.
> Q:     What other guy?
> A:     Manuel.
> Q:     But the officer did ask somebody to sit down?
> A:     I don't remember.

(Hernandez Dep. at 51-52).  With the exception of turning around toward Officer Pugh, Hernandez did not resist being placed in handcuffs, nor did he jerk away or yell while he was being arrested. (Criminal Trial Excerpts at 53-54).

_____

(Hernandez Dep. at 50).

[8] Officer Pugh testified that he took responsibility for handcuffing Hernandez in order to allow the other officers to keep their weapons aimed at the other unrestrained suspect still sitting in the vehicle.  (Criminal Trial Excerpts at 36-37; *see also* Criminal Trial Excerpts at 11 (Gregory Testimony)).

5

When Hernandez, who smelled of alcohol, did not comply with his repeated orders to sit down and instead turned toward him, Officer Pugh quickly assessed the situation and determined that the circumstances left him concerned about the officers' safety.  (Criminal Trial Excerpts at 38-39, 41; Pugh Dep. at 22-23).   Given that two officers had weapons drawn, one officer was "standing right next to us in very close proximity," at least one suspect was on the ground, and at least one suspect was unrestrained and sitting in a vehicle, Officer Pugh "decided it best that [Hernandez] needed to quickly [and] effectively be put on the ground [to] sit down" if he was not going to comply with verbal commands to do so.  (Criminal Trial Excerpts at 38-39, 41; Pugh Dep. at 22-23). Therefore, Officer Pugh "used the toe of my foot, struck him in the meaty part of his [] calf right in the muscle . . . . and as I struck him in the left part of his calf, I took him, got him down to the ground." (Criminal Trial Excerpts at 42-43; *see also* Criminal Trial Excerpts at 48-49; Pugh Dep. at 32).

The technique Officer Pugh used was a "PPCT strike" or "strike to the tibial nerve" performed with a kick from the toe.  (Pugh Dep. at 32).  When asked how hard he would "have to kick somebody in the leg to effectuate this strike to the tibial nerve," Officer Pugh responded: "As hard as I could." (Criminal Trial Excerpts at 55-56).   Officer Pugh's arrest report notes:  "Due to totality of the circumstances I did not feel it was safe to continue telling the suspect to sit down since there were other suspects unhandcuffed and officers with weapons unholstered.  I then used a strike to the tibial nerve and got the suspect to the ground.  Suspect injured his right foot at some point while he was resisting."  (Criminal Trial Excerpts at 50-51).

Hernandez testified as follows: "after [being checked for weapons], I know that somebody kicked me from the back.  And that's when I fell to the floor."  (Hernandez Dep. at 52).  Hernandez

6

began screaming and "said, my leg is hurting.  I think it's broken or something."  (Hernandez Dep. at 53).  After being assisted into a police car, Hernandez was transported via a five-minute ride to the Hoover City jail, and medics were called to examine his leg.  (Hernandez Dep. at 54-56). Hernandez then was transported from the jail to Cooper Green Hospital, where he refused treatment. (Criminal Trial Excerpts at 50-51; Hernandez Dep. at 59).   The next day, Hernandez received medical attention at another hospital of his choice, which revealed that surgery was necessary to repair his fracutred ankle and torn ligament. (Bailey Dep. at 15, 24-25; Hernandez Dep. at 67). Hernandez's ankle was severely damaged, and his injury likely has resulted in partial permanent impairment to his foot.  (Bailey Dep. at 22-23).

Hernandez was charged with public intoxication and resisting arrest based upon "[t]he fact that I could smell an odor of alcohol from his person as I began to discuss with him the fact that he was incoherent or seemingly so when Sergeant Gregory was giving him verbal commands and the fact that he wanted to be argumentative with me once I had him in my custody." (Pugh Dep. at 46-47; *see also* Criminal Trial Excerpts at 43).   Plantiff later was acquitted of all charges by the Hoover Municipal Court.  (Doc. # 28, Ex. 6).

Officer Pugh served as a police officer for the City from October 2001 until July 2004 and is certified by the Alabama Police Officers Standards and Training Commission.  (Pugh Aff; Doc. # 20, Ex. 12).  Officer Pugh has been trained on the standard operating procedures of the Hoover Police Department, including the use of pressure-point control tactics.  (Doc. # 20, Exs. 2, 12). Officer Pugh instructs other officers how to use the tibial strike maneuver that he used on Hernandez. (Criminal Trial Excerpts at 41).

### III.    Applicable Substantive Law and Discussion

Hernandez alleges that Officer Pugh used excessive force when, during the course of arrest, he used a strike to the tibial nerve and took him to the ground, which resulted in serious injuries to Hernandez's ankle and leg.[9]  Hernandez correctly asserts his claim under the Fourth Amendment to the United States Constitution:  "All claims that law enforcement officers have used excessive force -deadly or not- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 394 (1989).

Officer Pugh has raised the affirmative defense of qualified immunity, which is designed to greatly limit litigation against police officers (and other state actors) in their individual capacities. The purpose of qualified immunity is "to ensure that before they are subjected to suit, [police] officers are on notice [that] their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Therefore, "the salient question . . . is whether the state of the law [at the time of the events in question] gave [the officer] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).   Indeed, the defense is so broad that only those officers who are "plainly incompetent and those who knowingly violate the law" are required to defend against individual liability claims.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *GJR*

---

[9] Given that Hernandez admittedly has abandoned all claims against Officer Pugh other than excessive force, the court is perplexed by Hernandez's additional assertion in his summary judgment brief that his arrest was unlawful.  (Doc. # 26, at 25-26).   This is not a claim before the court.  In any event, the fact that Hernandez was later acquitted of the public intoxication and resisting arrest charges does not make his arrest unlawful in the first instance, especially given that Hernandez concedes he had consumed four beers prior to his arrest. (Hernandez Dep. at 36-37).

*Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998). The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir.1994).

###### A.      Standards for Evaluating a Defense of Qualified Immunity

To be entitled to qualified immunity, a defendant must establish "that he [] acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir.1992).[10] Once this is proven - and no one disputes that Officer Pugh acted within his discretionary authority in this case - the burden shifts to the plaintiff to show that qualified immunity is not applicable. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir.2004).

"In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was 'clearly established' at the time he did it." *Crosby*, 394 F.3d at 1332. "The threshold inquiry is whether plaintiff's assertions, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). If the court determines that the plaintiff has not alleged a deprivation of a constitutional right, then the inquiry ends. *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998).

------

[10] The term 'discretionary authority' includes all acts of a governmental official that are (1) undertaken pursuant to the performance of official duties and (2) within the scope of the official's authority. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir.1994). It is undisputed that, during the events in question, Pugh was acting in his capacity as a police officer. Therefore, his acts were within the scope of his discretionary authority.

However, if the court determines that the plaintiff has, in fact, alleged a deprivation of a constitutional right, then further inquiry is needed as to "whether that right allegedly implicated was clearly established at the time of the events in question." *Lewis*, 523 U.S. at 841 n. 5. "Clearly established" rights must be "developed [] in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).[11]  "While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them. A principle of constitutional law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.'" *Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004)(quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997) and *Hope v. Pelzer*, 536 U.S. 730 (2002)).[12]  Only Supreme Court, Eleventh

---

[11] There is a temporal requirement related to this inquiry.  A plaintiff must show that a reasonable public officer would not have believed his actions to be lawful in light of law that was clearly established *at the time* of the purported violation. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996).

[12] The Eleventh Circuit has explained:

> The Supreme Court, in *Hope*, cautions against a "rigid gloss on the qualified immunity standard" that would require materially similar, preexisting cases in all circumstances when the qualified immunity defense is to be overcome. *Hope*, 122 S.Ct. at 2512. Such a "rigid gloss" would be in variance with the law of the Supreme Court and the law of this Circuit. We have denied qualified immunity in the absence of precedents with similar facts. We have said, in the context of excessive force cases, that an official's conduct could run so afoul of constitutional protections that fair warning was present even when particularized caselaw was absent: "the official's conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Priester*, 208 F.3d at 926 (internal quotation marks omitted and second alteration in original).

Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this Circuit. *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

> **B.     Standards for Evaluating Whether the Facts Underlying an Excessive Force Claim Rise to the Level of a Constitutional Violation**

It is well-settled that the use of excessive force violates the Fourth Amendment. *Thorton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (determining that officers' use of any force violates clearly established law when officers do not suspect that arrestee has committed any serious crime and arrestee neither poses immediate threat of harm nor actively resists arrest) (citing *Graham v. Connor*, 490 U.S. 386, 394 (clearly establishing that use of excessive force in carrying out arrest constitutes Fourth Amendment violation)).   In analyzing an excessive force claim to determine whether the plaintiff has alleged deprivation of a constitutional right, the key inquiry "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.   It is well-established that the government's right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.   The court must be mindful to judge an officer's acts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.   Moreover, the court must allow for the fact that police officers "must often make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

---

*Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003).

From this perspective, the court must evaluate both whether any force was necessary and, if some force was justified, whether the amount of force used was reasonable.  In evaluating the need for application of force, a court balances several factors "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Once it is determined that force was needed, the amount of force used by the officer must be reasonably proportionate to the need.  *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).  "[I]n determining if force was reasonable, this court must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Lee*, 284 F.3d at 1197-98 (citations and footnote omitted).

For the reasons outlined below, the court finds that Officer Pugh's use of a strike to the tibial nerve -- a tactic often used to force a suspect to the ground -- was reasonably necessary and proportionate to the tense and uncertain situation that Pugh and the other officers faced during the arrest of Hernandez and the others in the car on the night of July 12, 2003.

### 1.      Evaluation of the Need for Application of Force

When determining whether Officer Pugh had a need to apply force, this court must analyze not only the severity of the crimes, but also whether Hernandez's actions posed an immediate threat to the safety of the officer or others, and whether he was actively resisting arrest or attempting to flee.  *Graham*, 490 U.S. at 396.  Both the reason why Hernandez and the other suspects were stopped initially - suspicion of engaging in an altercation - and the crimes with which Hernandez was charged

eventually - public intoxication and resisting arrest - were undisputedly minor in severity.[13]  Thus, the court's analysis will focus on whether Hernandez's actions were such that some level of force was necessary to get control of the situation.

Viewing the facts from Hernandez's perspective - which the court must - paints a less than complete picture of what happened during the arrest.   Although numerous officers testified that Hernandez failed initially to comply with the officers' instructions when exiting the vehicle (Criminal Trial Excerpts at 10-11 (Gregory Testimony), 36 (Pugh Testimony); Gregory Dep. at 14; Pugh Dep. at 21, 24-25), Hernandez's deposition testimony states only: "I got out of the car and they put the handcuffs there."  (Hernandez Dep. at 50).  It does appear from Hernandez's summary judgment brief that he concedes he did not immediately comply with the orders to exit the vehicle, and thus the court finds it undisputed that Hernandez exhibited some level of non-compliance. (Doc. # 26, at 8 ("After some initial confusion, Mr. Hernandez did as the officers commanded and approached them with his hands in the air and his back towards the armed officers." (citing Criminal Trial Excerpts at 35-37)).  Moreover, although all of the officers present at the scene recalled that Hernandez was again noncompliant with Officer Pugh's four different commands to sit down, (Criminal Trial Excerpts at 12 (Gregory Testimony), 37-38, 40 (Pugh Testimony); McDonald Dep. at 11-19; Gregory Dep. at 15; Pugh Dep. at 22; Pugh Aff; Philson Dep. at 8), Hernandez claims that he does not recall whether Pugh asked him to sit down.  (Hernandez Dep. at 51-52).  However, because Hernandez initially testified that he did hear an officer tell *someone* to sit down, the court

---

[13] In any event, this factor is not dispositive given that when Officer Pugh arrived at the scene, he did not know why the suspect vehicle had been pursued initially.  (Criminal Trial Excerpts at 41). Thus, viewing the situation from a reasonable officer's perspective, Officer Pugh did not know whether Hernandez and the other suspects were suspected of a major crime like armed robbery or a minor crime like speeding.

also finds it undisputed that at least one command to sit down was given.  (Hernandez Dep. at 51-52). ("Q:Did the officer ask you to sit down? A:As far as – I don't know that he was talking to me, you know . . . .)(Hernandez Dep. at 51-52).  Hernandez does admit that he turned around toward Officer Pugh and asked why are you arresting me"  (Hernandez Dep. at 51; Pugh Dep. at 22-27; Criminal Trial Excerpts at 12 (Gregory Testimony), 37-38 (Pugh Testimony); McDonald Dep. at 12), and he also admits that he was under the influence of alcohol at the time having previously consumed four beers. (Hernandez Dep. at 38-39).

Thus, viewing the facts from the Hernandez's perspective, and filling in the gaps with the undisputed testimony from the officers at the scene, the court finds that an officer in Pugh's situation could have reasonably concluded that, despite the minor severity of the crimes (both suspected and eventually charged), Hernandez posed an immediate threat to the safety of the officers at the scene given his failure to comply with Pugh's orders to sit down.   Hernandez admits that he had been drinking, and Pugh smelled alcohol on his breath.  Pugh had good reason to want Hernandez on the ground as soon as possible given that at least one other suspect was still unsubdued in the car and the officers close to Pugh and Hernandez still had their weapons drawn.  Given Hernandez's affected state, his failure to comply with verbal commands, and the uncertain and potentially dangerous situation of drawn weapons and an unrestrained suspect, it was entirely reasonable for Pugh to conclude that some force was needed to get Hernandez to the ground as quickly as possible.

Hernandez's argument that no amount of force was justified because he was already handcuffed is simply not persuasive given the circumstances in this case.  Although Hernandez cites to cases in which the Eleventh Circuit found that excessive force was used on an individual who was already handcuffed, those cases are distinguishable from this case.   Here, Hernandez had failed to

14

comply with the officers' initial instructions when he exited the car, and he again failed to comply with Pugh's instructions to sit down, instead turning toward Pugh to ask him a question. The force used by Officer Pugh in this case was purposeful -- the tibial strike is a maneuver that temporarily disables a suspect's leg muscles so that the suspect can be forced to the ground. By contrast, all of the cases cited by Hernandez involved force that was used for no apparent reason on handcuffed suspects who had not resisted either physically or verbally, had apparently complied with the officers' commands, and when the situation was under control such that no danger existed to the arresting officer or other officers at the scene. *See*, *e.g. Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)(reversing a grant of qualified immunity for an officer who forcibly grabbed and used pepper spray on a female suspect who was secured with handcuffs in the back of a patrol car behind a glass partition); *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (finding no basis for qualified immunity in a case where an officer led a handcuffed female suspect to the back of her car and slammed her head against the trunk); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (reversing district court's grant of qualified immunity for officers who repeatedly kicked plaintiff in the ribs and beat his head on the ground knocking him unconcious even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way); *Priester v. City of Riviera Beach, Florida*, 208 F.3d 919, (11th Cir. 2000)(finding that officers were not entitled to qualified immunity in a case where the officers ordered and allowed a police dog to attack and bite plaintiff for two minutes even though the plaintiff had complied with the officers' orders to get down on the ground and had submitted to police control); *Sheth v. Williams*, 145 F.3d 1231, 1238 (11th Cir. 1998) (finding that officer was not entitled to qualified immunity when, even though plaintiff posed no danger to the officer or others, the officer still handcuffed her and then dragged her to the police

15

car) *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997) (finding that, in a case where the plaintiff was down on the ground and offering no resistance, officer who broke plaintiff's arm requiring surgery for multiple fractures while on his back handcuffing him was not due qualified immunity); *see also Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *modified in part*, 14 F.3d 583 (11th Cir. 1994) (noting that although no force was needed on a suspect who was handcuffed and non-resistant, the amount of force used (pushing) was not plainly unlawful and therefore Defendant was entitled to qualified immunity).

Thus, the court finds that some force was justified in this case even though Hernandez already had been handcuffed.  Hernandez was not complying with Officer Pugh's orders to sit down, at least one other suspect was unrestrained, and the other officers' weapons were unholstered.  For all Officer Pugh knew, the unrestrained suspect could have had a weapon concealed in the car and could have taken advantage of Hernandez's non-compliance -- and the subsequent distraction that resulted from trying to subdue him -- to attack the officers.  Given the circumstances and the risks inherent in apprehending any suspect, an officer in Pugh's position reasonably could have concluded that it was imperative to keep Hernandez, who had not been entirely cooperative, subdued and get him to the ground as soon as possible so that the other suspect could be restrained.

### 2.     Evaluation of the Level of Force Utilized

Moreover, the court finds that the level of force used by Officer Pugh was not excessive under the circumstances.  "[I]n determining if force was reasonable, this court must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted."  *Lee*, 284 F.3d at 1197-98 (citations and footnote omitted).  There is no bright line for identifying force as excessive -- "[t]he hazy border between permissible

16

and forbidden force is marked by a multifactored case-by-case balancing test." *Smith v. Maddox*,

127 F.3d 1416, 1419 (11th Cir. 1997).

In this case, the undisputed evidence suggests that the strike technique used by Officer Pugh

is one method used by police officers to force a suspect to the ground by causing temporary muscle

cramping.  As Sergeant Gregory, a defensive tactical instructor, explained, a tibial nerve strike is "a

strike to the nerve around the back of the calf, which [] causes a sympathetic reflex.  It . . . would

cause your other knee to buckle also and you would go to the ground."  (Criminal Trial Excerpts at

23).   The PPCT Defensive Tactics Manual explains that the tibial nerve motor point "is used . . . for

displacing the subject's balance . . . ."  (Doc. # , Ex. 16, at "Defensive Tactics Student Manual," page

6-6).  Thus, the court finds that the reason why force was needed - to compel Hernandez to sit when

he refused to obey verbal commands - was directly related to the type of force used by Officer Pugh -

a tibial nerve strike which enables an officer to subdue a suspect and force him to the ground.

Hernandez's argument that,  under a strict reading of the PPCT Defensive Tactic guidelines,

a different nerve strike should have been selected is nothing more than an attempt to second-guess

Pugh's split-second decisions using 20/20 hindsight.  As the Supreme Court has made clear, this is

the wrong manner in which to make the inquiry.  *Graham*, 490 U.S. at 396.  Hernandez contends

because he "only used verbal noncompliance and passive resistance . . . . the proper [strike] in this

situation would have been a knee strike to a nerve located at mid-thigh, followed by a wrist-lock

technique."  (Doc. # 26, at 25).  While Hernandez's proposed response may be appropriate from the

perspective of a police officer teaching PPCT defensive tactics from the safety of a classroom, it

certainly is not the only appropriate response from the perspective of a police officer attempting to

subdue a non-compliant suspect who smells of alcohol in the midst of an escalating multi-suspect

arrest with armed officers and weapons drawn.  The Eleventh Circuit has made clear that this court must judge Officer Pugh's decisions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In any event, Hernandez's focus on the technical requirements of the PPCT defense tactics system is misplaced.  Although the Hoover Police Department generally relies on the tactics outlined in the PPCT manual, the Department's Standard Operating Procedures make clear that the level of force needed in any situation are subjective and dependent upon both the type of resistance offered and the potential danger to any officers present at the scene.  (Doc. # 24, at 15 "Standard Operating Procedures" § 1900.02).  "It is important to note that each officer's perception of the danger of the level of resistance will be based upon his/her past training, experience, and knowledge of physical control techniques."  (Doc. # 24, at 15 "Standard Operating Procedures" page 1900.02).  Even the PPCT manual recognizes that certain situations may increase the likelihood of a suspect's resistance, including "when the citizen is under the influence of alcohol or a drug," as Hernandez admits that he was.  (Doc. # 28, Ex. 7, at "Defensive Tactics Instructor Manual" page 3-16).  This court, in evaluating Pugh's qualified immunity defense, must allow for the fact that police officers "must often make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Hernandez's contention that Officer Pugh should have used pepper spray, a lower form of control, before resorting to a strike tactic is equally unpersuasive.  Although perhaps Hernandez is correct that pepper spray may have been an effective, but less damaging, method to compel Hernandez to sit down, this court will not second-guess Officer Pugh's decision to use physical force

rather than pepper spray given the close proximity of the other officers and the fact that at least one

other suspect was unrestrained.  As Sergeant Gregory observed, although pepper spray is a lower

level of force on the continuum than a tibial nerve strike, it is not always appropriate to use pepper

spray over a strike or kick:

> [Y]ou have to evaluate your situation and your surroundings. With Mr. Hernandez
> and Officer Pugh right behind us.  I've been sprayed. I know what the effects are to
> me.  Every officer in our department ha[s] been sprayed and know[s] what the effects
> are.  If Officer Pugh elected to utilize his aerosol spray at that time it gets in the air
> and is going to affect me due to the proximity to each other. Once it affects me, I am
> no good. So you have to go from dealing with individual suspects and you have an
> officer that is affected by the spray, you have to do something with me because I have
> a weapon out.  It's insecure in my hands.

(Criminal Trial Excerpts, at 25-26).  Once again, this court will not play Monday morning

quarterback regarding Officer Pugh's decision to use a strike, which is contained, rather than pepper

spray, which very well could have disabled the other officers around him.

     To be clear, the court is concerned with the severity of Hernandez's injury.  However, the

undisputed evidence suggests that the extent of Hernandez's injuries likely was not the result of

Pugh's kick alone, but the subsequent force of Hernandez's body weight on the injury.  (Bailey Dep.

at 42-43) ("[A]n injury like this has got to involve the patient's body weight . . . . It could be applied

in this case if someone were falling and then additional force was applied from being kicked from

behind.").  Although Hernandez's brief suggests that Officer Pugh caused that exacerbated injury

by "shoving" Hernandez to the ground (Doc. # 26, at 24), that bald assertion is simply not supported

by Hernandez's testimony about what happened that evening (or any other record evidence for that

matter).  Hernandez's testimony states only that "somebody kicked me from the back.  And that's

when I fell to the floor." (Hernandez Dep. at 52). The court finds no evidence to suggest that the severity of Hernandez's injury was the result of excessive force used by Pugh.

Thus, the court finds that given the circumstances in this case, the tibial strike used by Officer Pugh was purposeful and effective to force a non-compliant Hernandez to sit down on the ground and ensure the safety of the other officers at the scene. Because Hernandez has failed to establish that Officer Pugh's actions constituted a constitutional violation, Officer Pugh is due the protection of qualified immunity.

**IV.     Conclusion**

Officer Pugh has carried his burden on summary judgment of demonstrating that there are no material facts in dispute and that he is entitled to the protection of qualified immunity, and therefore judgment as a matter of law, on Hernandez's excessive force claim against him under §1983. Having concluded that summary judgment will be granted as to the only remaining federal claim in this case, the court, in its discretion pursuant to 28 U.S.C. § 1367(c)(3) declines to exercise jurisdiction over the remaining state law claims, and will enter an order dismissing them without prejudice.

**DONE** and **ORDERED** this _____7th_____ day of June, 2006.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

20